UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HANS FUREY,

           Plaintiff,

    v.

METROPOLITAN LIFE INSURANCE COMPANY,

           Defendant.

Case No.  19-cv-02144-DMR

**ORDER ON CROSS MOTIONS FOR JUDGMENT**

Re: Dkt. Nos. 22-25

This is an action for long-term disability benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a), brought by Plaintiff Hans Furey against Defendant Metropolitan Life Insurance Company ("MetLife").  MetLife submitted the administrative record under seal and the parties filed cross motions for judgment pursuant to Federal Rule of Civil Procedure 52.  [Docket Nos. 22 (Pl.'s Mot.), 23-24 (Def.'s Mot.), 25 (Pl.'s Opp'n).]  The court heard oral argument on May 28, 2020.  The court now issues the following findings of fact and conclusions of law under Rule 52 and grants Furey's motion for judgment.

## I.    FINDINGS OF FACT

The following findings of fact are based upon the administrative record submitted by MetLife.

### A.    Furey's Employment with Verizon and Long-Term Disability Insurance Coverage

Furey is 41 years old.  He worked at Verizon Wireless ("Verizon") as an Account Executive, Business Sales from 2013 to 2015.  His job duties included calling on small to mid-size businesses to acquire and retain their accounts with Verizon, including prospecting, cold calling, and engaging in customer retention activities.  He frequently drove in the field to make sales calls.

United States District Court
Northern District of California

1     Administrative Record ("A.R.") 954-55 (Furey Decl., Apr. 11, 2018) ¶ 4, 1941-42.

2         During his employment, Furey was covered by Verizon's long-term disability insurance

3 plan. MetLife is the claims administrator for the plan. A.R. 3, 38, 41-97. Under the plan, Furey

4 was eligible for long-term disability benefits up to age 67 (after a 26-week elimination period) at

5 60% of his pre-disability income if he established that he satisfied the definitions of "disability" or

6 "disabled." A.R. 57. The plan defines "disability" and "disabled" as follows:

7
> Disabled or Disability means that, due to Sickness or as a direct
> result of accidental injury:

8

9
> - You are receiving Appropriate Care and Treatment and
>   complying with the requirements of such treatment; and

10
> - You are unable to earn:

11
12
> - during the Elimination Period and the next 24 months of
>   Sickness or accidental injury, more than 80% of Your
>   Predisability Earnings at Your Own Occupation from any
>   employer in Your Local Economy; and

13

14
15
> - after such period, more than 60% of your Predisability
>   Earnings from any employer in Your Local Economy at any
>   gainful occupation for which You are reasonably qualified
>   taking into account Your training, education and experience.

16 A.R. 58.

17         The plan contains a limitation on long-term disability benefits for disability due to mental

18 or nervous disorders (the "mental health limitation"). It states in relevant part:

19
> If You are Disabled due to one or more of the following, We will
> limit Your Disability benefits to a lifetime maximum equal to the
> lesser of:

20

21
> - 24 months; or

22
> - the Maximum Benefit Period.

23
> Your Disability benefits will be limited as stated above for:

24
> 1. a Mental or Nervous Disorder or Disease except for:

25
> - schizophrenia;

26
> - dementia; or

27
> - organic brain disease[.]

28
> . . .

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

> **Mental or Nervous Disorder or Disease** means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the Diagnostic And Statistical Manual Of Mental Disorders as of the date of Your Disability.  A condition may be classified as a Mental or Nervous Disorder or Disease regardless of its cause.

A.R. 75.

### B.    Furey's Medical Conditions and Long-Term Disability Claim

In 2014, Furey began experiencing fatigue and started taking long naps, something he had never done before.  Furey Decl. ¶ 4; *see also* A.R. 957-58 (Alma Furey Decl., Apr. 11, 2018) ¶ 3.  Following tests, Furey was diagnosed with hemochromatosis on July 28, 2014 by a hematologist, Kasra Karamlou, M.D.  Dr. Karamlou noted that Furey "already has some liver dysfunction" and complained of fatigue.  A.R. 876-78.  Dr. Karamlou recommended that Furey undergo phlebotomy to address his ferritin level and iron saturation and also recommended that his testosterone levels be checked.  A.R. 878.

Furey started phlebotomy on August 1, 2014.  In a progress note dated August 8, 2014, Dr. Karamlou noted that Furey continued to complain of fatigue and that lab tests revealed low testosterone.  A.R. 878-80.  Dr. Karamlou referred Furey to endocrinologist Douglas Zlock, M.D. for evaluation.  A.R. 880.  A lab test from October 2014 again shows low testosterone.  A.R. 598.

At some point in 2014 Furey stopped working in order to undergo phlebotomies.  He returned to work later in 2014.  Furey Decl. ¶¶ 4, 5.  On February 6, 2015, Furey reported to Dr. Karamlou's Nurse Practitioner that "he has been having problems with social anxiety and depressed mood over the last 2-3 months" and that his primary care doctor had referred him to a psychologist for evaluation.  A.R. 896.  On February 23, 2015, he reported to Dr. Karamlou that he was "not feeling like himself," that "he has had apathy and . . . [l]oss of interest in many things."  A.R. 897.

Furey went on disability leave in February 2015.  His last day of work was February 26, 2015.  A.R. 145.  He received short-term disability benefits from March 5, 2015 to August 26, 2015; in its claim notes, MetLife noted that he was not working "due to depression, major."  A.R. 148.  Furey then applied for long-term disability benefits.  A.R. 339, 1905-11.  In his application

1  for long-term disability benefits, he listed his disabling conditions as "Depression, Anxiety,

2  A.D.D., Hemochromatosis, low testosterone." A.R. 1905. He listed two attending physicians for

3  his conditions: Raymond Ruzicano, a psychiatrist; and Peter Oppermann, a psychologist. A.R.

4  1905. In response to questions about his activities, he wrote that he does not do any housework; in

5  response to a request for an explanation, he wrote "lethargic/no energy." A.R. 1908. Furey gave

6  MetLife authorization to obtain medical records from his providers. A.R. 1897-99.

7       MetLife approved Furey's application for long-term disability benefits and he began

8  receiving benefits on August 27, 2015, but the record does not contain a letter or other record of

9  communication by MetLife to Furey regarding its approval of his application or the basis for its

10  approval. In correspondence dated August 23, 2017, MetLife stated that it had previously

11  approved Furey's claim for long-term disability benefits "due to the mental nervous conditions of

12  Bipolar Disorder II, ADHD, and Generalized Anxiety Disorder." A.R. 1743.

13  **C.    MetLife's Receipt of Evidence of Furey's Medical Conditions and Termination
        of Benefits**

14

15       Following Furey's initial receipt of long-term disability benefits in August 2015, MetLife

16  received additional materials from Furey's health care providers which evidenced and/or

17  referenced his liver-related impairments. In August 2015, Furey's treating endocrinologist,

18  Douglas Zlock, M.D., submitted records from a March 24, 2015 visit. A.R. 1869-76. In the note,

19  Dr. Zlock noted Furey "presents for follow up of hypogonadism; hemochromatosis," and noted

20  Furey's complaints of "more fatigue and depressed in the past few months. Wonders if it could be

21  testosterone levels or thyroid levels." A.R. 1874. Dr. Zlock prescribed a higher daily dose of

22  testosterone. A.R. 1875.

23       Furey's mental health care providers also referenced his medical conditions in

24  documentation they provided to MetLife. In July 2015, Dr. Ruzicano, Furey's treating

25  psychiatrist, completed a Behavioral Health Supplemental Functional Assessment Form. A.R.

26  1887-89. Dr. Ruzicano listed hemochromatosis as Furey's sole medical condition and identified

27  decreased concentration, energy, and focus along with "moderately severe anxiety" as the

28  "specific symptoms, deficits, or functional impairments . . . continuing to inhibit [Furey] from

1    returning to his . . . job." A.R. 1887.  On April 14, 2016, MetLife received a voicemail from Dr.

2    Oppermann, Furey's treating psychologist, stating Furey's "hemochromatosis is not getting

3    better," and that Furey "is still struggling with depression, anxiety and lack of purpose . . . he has

4    had some improvement overall [but] he is still having a difficult time." A.R. 190-91.  Later in

5    April 2016, another treating psychiatrist, J. Kirk Hartman, M.D., submitted a Behavioral Health

6    Supplemental Functional Assessment Form.  A.R. 1842-44.  Dr. Hartman listed hemochromatosis

7    as Furey's medical condition.  A.R. 1843.  An August 2017 Behavioral Health Supplemental

8    Functional Assessment Form completed by Dr. Hartman listed "elevated liver enzymes" under

9    "other medical conditions." A.R. 1749.

10       MetLife also received copies of correspondence from the Social Security Administration

11   ("SSA") in April 2016 and September 2016 regarding Furey's application for Social Security

12   Disability Insurance ("SSDI") benefits.  A.R. 1798-1804, 1836-41.[1]  The correspondence

13   referenced Furey's claim that he is "unable to work" due to "liver disease and hemochromatosis,"

14   in addition to "depression, anxiety, stress, attention deficit disorder, diabetes, [and] insomnia."

15   *See id.*  Additionally, Furey submitted an "Activities and Financial Inquiry" to MetLife in August

16   2017 which he listed the names of his non-psychiatric medical providers, including treating

17   hematologist/oncologist Robert Robles, M.D., hepatologist Jennifer Price, M.D., and

18   endocrinologist Douglas Zlock, M.D.  A.R. 1755-57.

19       According to claim notes, on August 7, 2017, MetLife requested medical updates from

20   Furey's mental health care providers Dr. Hartman and Dr. Oppermann.  A.R. 206-07.  The notes

21   also show that on August 8, 2017, a MetLife claim specialist called Furey to advise him that "if no

22   medical update received w/in 2 weeks claim will be terminated." A.R. 208.  There is no evidence

23   in the record that MetLife requested medical records from any of the providers treating Furey for

24   his liver-related impairments.  An August 23, 2017 claim note reflects MetLife's determination

25

26   _____

27   [1] Furey's application for SSDI benefits was denied initially and upon reconsideration.  A.R. 1838-
     41 (Apr. 15, 2016 denial); 1800-04 (Sept. 29, 2016 reconsideration).  Following a hearing, an
     administrative law judge ("ALJ") issued an opinion on July 11, 2018 in which he concluded that

28   Furey had been under a disability as defined in the Social Security Act since February 26, 2015
     and the SSA awarded Furey SSDI benefits, as discussed further below.  A.R. 455-62.

United States District Court
Northern District of California

that Furey was not entitled to long-term disability benefits after August 26, 2017:

> [Furey] will have received 24 months of LTD benefits on August 26, 2017 for his conditions of Bipolar Disorder II, ADHD and Generalized Anxiety Disorder and this is the maximum period payable under the Plan for a Mental/Nervous Disorder. Therefore, EE benefits are approved through 8/26/2017 and claim is terminated effective 8/27/2017. No additional benefits will be payable after 8/26/2017, and his disability claim will have been paid in full in accordance with the terms of the Plan.

A.R. 220.

In a letter dated August 23, 2017, MetLife notified Furey for the first time that his benefits were limited to 24 months of benefits because his disability "is caused by [his] mental health conditions"; specifically, Bipolar Disorder II, ADHD, and Generalized Anxiety Disorder. Therefore, it stated, no additional benefits would be payable after August 26, 2017. A.R. 1743-45.

### D.   Furey's Appeal and Dr. Schmidt's Review

Furey appealed MetLife's termination of his long-term disability benefits on April 12, 2018. A.R. 855-958. In his appeal, he argued that MetLife failed to consider whether his "disabling physical condition of hemochromatosis" rendered him disabled under the plan. He asserted that he "continues to suffer from debilitating physical fatigue" due to hemochromatosis. A.R. 856.

Furey submitted with his appeal evidence of his hemochromatosis from 2014 through 2017, including hematology records from Dr. Karamlou and Dr. Robles at Diablo Valley Oncology and Hematology Medical Group, Inc. A.R. 867-920. In a September 2014 treatment note, Dr. Karamlou described Furey's symptoms of liver dysfunction:

> I am currently treating Mr. Furey for hereditary hemochromatosis. He had significant symptoms at the time of his presentation associated with this disease including liver dysfunction and also hormonal disturbances with required immediate therapy. The patient has been receiving phlebotomy on a weekly basis and over the next couple weeks his symptoms are about to improve. Certainly the original presenting symptoms could have had an impact on his functional abilities.

A.R. 867. Dr. Karamlou wrote in a June 8, 2016 treatment note that Furey had reported "increased fatigue," and Dr. Robles wrote on August 28, 2017 that Furey had "elevated [liver function tests]" and had been diagnosed with NASH. A.R. 912, 919.

6

United States District Court
Northern District of California

1    Furey also submitted a Cardiopulmonary Exercise Test (CPET) Evaluation Report by

2  Christopher R. Snell, Ph.D. documenting two days of testing in January 2018.  A.R. 921-52.

3  According to Dr. Snell, CPET "is considered the gold standard for measuring and evaluating

4  functional capacity and fatigue," and "peak oxygen consumption . . . [is] the most accurate

5  measurement of functional capacity."  A.R. 922.  The report states that Furey's effort in testing

6  was "normal" and that there was no evidence of malingering, and documents abnormal results in

7  the categories of metabolic responses, workload, cardiovascular responses, respiratory responses,

8  and recovery response.  A.R. 923.  According to Dr. Snell, Furey's "[p]eak oxygen consumption

9  was only 66-65% [sic] of predicted and below the 18 mL/kg/min Social Services Administration

10  criteria for disability in cases of cardiovascular disease."  A.R. 923.  He opined that Furey's

11  "abnormal exercise response and early onset of ventilator/anaerobic threshold points to significant

12  impairment," and that "even a sedentary job would require more energy than [Furey] is able to

13  safely sustain."  A.R. 926.  He ultimately concluded that Furey "demonstrates cardiopulmonary

14  anomalies and reduced function post-exertion," which "will severely limit his ability to engage in

15  normal activities of daily living and precludes employment of even a sedentary/stationary nature."

16  A.R. 921.

17    Furey also submitted sworn declarations by himself and his wife describing his physical

18  conditions and the severe fatigue he experiences.  In his declaration, Furey states that "since [he]

19  stopped working I remain severely fatigued most of the time," and that "[o]n most days, even

20  minor tasks like using a vacuum, washing the dishes or walking up a flight of stairs exhaust me

21  and I have to lie down and/or take a nap for 1-3 hours every few hours" to recover.  Furey Decl. ¶

22  6.  He also states that he occasionally has "'good' days where I feel a little better" but since he

23  stopped working, he never has good days more than 2-3 days per week.  *Id*. at ¶ 7.  Furey's wife

24  Alma Furey states that "even small things make [Furey] completely exhausted," and that

25  "[t]hroughout the day, [Furey] frequently has to lie down or take a long nap, which can last as

26  long as 3-4 hours."  Alma Furey Decl. ¶ 4.

27    In response to Furey's appeal, MetLife engaged medical reviewer Judy Schmidt, M.D.

28  through third party vendor Genex.  In a May 7, 2018 report, A.R. 843-46, Dr. Schmidt, who is

United States District Court
Northern District of California

7

1   Board Certified in Internal Medicine and Hematology-Oncology, concluded that the medical

2   information "does not support functional limitations due to a physical condition or combination of

3   physical conditions as of 08/27/2017[.]"  A.R. 844.  She wrote that Furey "has no signs/symptoms

4   of liver disease apart from mildly elevated liver function tests, and has no other complications of

5   the condition . . . to warrant functional impairment."  She concluded that Furey's claimed fatigue

6   "is not corresponding to the clinical evidence in the records."  She also noted the CPET results

7   "which revealed significant abnormalities," but found that "these are not clear in etiology or

8   origin."  A.R. 845.  Additionally, Dr. Schmidt noted that a recent progress report by Dr. Robles

9   "documented the claimant's performance status at 0, which is consistent with fully active status."

10  A.R. 844 (citing A.R. 920, Aug. 28, 2017 treatment note).

11      Furey submitted a response to Dr. Schmidt's review on May 24, 2018.  A.R. 779-99.  In

12  his response, he disputed Dr. Schmidt's claim that Furey has "no signs/symptoms of liver

13  disease," citing August 2017 lab results indicating the presence of ongoing liver disease.  *See* A.R.

14  779 (citing A.R. 919).  He submitted a letter from Dr. Robles in which he states that Furey "has a

15  diagnosis of hereditary hemochromatosis" and that individuals with the condition "are known to

16  have issues with fatigue, muscle and joint achiness."  A.R. 781.  He also submitted treatment notes

17  from Diablo Valley Oncology/Hematology dated December 28, 2017 and April 26, 2018 in which

18  Furey reported feeling "[f]atigued, lethargic."  A.R. 783-86.

19      In a June 6, 2018 addendum, Dr. Schmidt wrote that "[her] opinion remains unchanged,"

20  and that Dr. Robles's statement that "individuals with hemochromatosis are known to have issues

21  with fatigue, muscle and joint achiness" is "very general" and "not adequate to state someone is

22  functionally limited."  A.R. 774.

23      Furey provided additional evidence in response to Dr. Schmidt's June 6, 2018 addendum.

24  This included the following:

25  - Lab tests ordered by treating endocrinologist Dr. Zlock dated October 14, 2016,

26    March 16, 2015, and August 4, 2016 showing low testosterone levels.  A.R. 596-

27    99.

28  - Medical records from the University of California, San Francisco ("USCF")

documenting ongoing treatment for liver disease, including a December 2016 liver biopsy in December 2016 and diagnosis of steatohepatitis with focal centrizonal fibrosis (stage 1).  A.R. 601-67; *see* A.R. 664-65.

- Medical literature regarding symptoms of fatigue in cases of non-alcoholic fatty liver disease ("NAFLD").  A.R. 670-75.

Dr. Schmidt issued a second addendum on June 22, 2018.  A.R. 587-88.  She wrote that while hemochromatosis and low testosterone "can cause fatigue," Furey's diagnosis "currently is stable with no associated liver damage" and that hemochromatosis "is well manageable."  A.R. 588.  She also stated that "cardiopulmonary testing itself is . . . not adequate to state someone is functionally limited; there is no certain etiology or confirmed basis to support the results, not to mention possible test errors."  A.R. 588.

On July 6, 2018, Furey submitted additional evidence.  A.R. 497-513.  Included was a July 5, 2018 statement by Dr. Robles responding to Dr. Schmidt's note in her initial review that Dr. Robles "documented the claimant's performance status at 0, which is consistent with fully active status."  A.R. 499; see A.R. 844, 920.  According to Dr. Robles, his "listing of a Performance Status in Mr. Furey's treatment notes was in error, as [he] did not realize that [his] treatment notes included any listing of a Performance Status—the Performance Status is a measure used for cancer patients and not for patients with hemochromatosis."  He noted that Furey "has reported significant fatigue during his treatment, and the cardiopulmonary testing indicates cardiopulmonary impairment that is consistent with his reports of fatigue."  Further, according to Dr. Robles, "[t]he level of fatigue that patients with hemochromatosis experience does not depend on the presence or severity of any liver damage or cirrhosis."  A.R. 499.

Furey also submitted a September 15, 2017 progress note by Jennifer Price, M.D., Ph.D. in which she states, "Hans Furey is being treated at the UCSF Liver Clinic for nonalcoholic fatty liver disease (NAFLD) with nonalcoholic steatohepatitis (NASH) on liver biopsy."  A.R. 513.

Dr. Schmidt issued a third addendum on July 11, 2018, A.R. 472-73, in which she acknowledged that performance status is used to evaluate patients with cancer and stated that she now disregards the status.  A.R. 472.  She noted that hemochromatosis "is indeed an unfortunate

diagnosis" but that "the condition is clinically controllable, as evident in this case, with no documentation of an abnormal blood level or documented complications of disease." Further, she wrote that "[s]tating someone having [sic] an abnormal cardiopulmonary test, which may be interfered with many different errors, ranging from poor effort to measurement error, along with reported fatigue is neither adequate or evidence to recommend activity functions." According to Dr. Schmidt, her opinion about Furey's functionality could change with "documented complications of hemochromatosis, and laboratory evidence of uncontrolled iron levels." A.R. 472-73.

### E.    The Social Security Decision and MetLife's Denial of Furey's Appeal

On July 11, 2018, following a hearing, an ALJ issued a decision finding Furey disabled under Social Security regulations and awarding him SSDI benefits. A.R. 455-61. The ALJ determined that Furey has the following severe impairments: "hemochromatosis and other blood disorder (NASH), endocrinological disorder (testosterone irregularity), depression, and a bipolar disorder." A.R. 459. The ALJ assessed the following residual functional capacity ("RFC"):

> The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) (lift and carry 10 pounds frequently and 20 pounds occasionally; sit, stand, or walk for six hours each in an eight-hour workday, and push/pull to the same weight limits) *except he could walk for only two hours*. He occasionally could climb ramps, stairs, ladders, ropes, or scaffolds. *He would be absent from work two days a month* and he could sustain only limited interaction with the public.

A.R. 459 (emphasis added). The ALJ noted that "[p]hysically, the claimant is limited to a range of light exertional work, primarily due to fatigue and malaise," and "[m]entally, the severity of [Furey's] impairments nearly meets the requirements of a listing." A.R. 460. He concluded that Furey is unable to perform any past relevant work, and that considering his age, education, work experience, and RFC, "there are no jobs that exist in significant numbers in the national economy that [he] can perform." A.R. 460. Given Furey's expression of "a strong desire to get back to work," the ALJ found that "a review in about 18 months is appropriate to determine whether he meets his goals." A.R. 460.

Furey submitted the Social Security decision to MetLife, A.R. 452-53, and on August 6,

2018, Dr. Schmidt issued a fourth addendum.  A.R. 447-48.  In her addendum, Dr. Schmidt reiterated her position that "a cardiopulmonary testing without a certain etiology or organic basis is again not adequate to state the claimant is limited, especially resulting from hemochromatosis." A.R. 447.  Dr. Schmidt briefly addressed the Social Security decision, stating her disagreement with the ALJ that "NASH is not a blood disorder" and writing that with respect to the severe impairment of "endocrinological disorder (testosterone irregularity)," "testosterone deficiency may cause some symptoms in individuals" but "is medically manageable with replacement of the deficient hormone."  A.R. 447-48.

On August 31, 2018, MetLife issued a denial of Furey's appeal of the termination of his claim.  A.R. 421-27.  In its denial, MetLife wrote that it had "carefully reviewed" "[a]ll information regarding Mr. Furey's claim" and that "the entire claim file was reviewed by an Independent Physician Consultant, (IPC), Board Certified in Hematology and Internal Medicine." A.R. 422.  It concluded that "on appeal review we have determined that the medical information on file does not support functional limitations due to a condition not limited by his employer's Plan, which would prevent him from performing his sedentary job or any occupation due to a physical condition or combination of physical conditions."  A.R. 425.

MetLife also addressed the Social Security decision, noting that the Social Security Administration "is separate and governed by different standards than MetLife's review and determination which is governed by the terms of Mr. Furey's employer's Plan."  According to MetLife, "the ALJ decision states Mr. Furey was limited to light physical demand work based on his physical conditions; and his job with Verizon Wireless was reported as sedentary."  Therefore, it wrote, "after considering all the information we determined Mr. Furey no longer met the definition of Disability contained in his employer's Plan for a physical condition or conditions not limited by the Plan."  A.R. 425.

**F.      Furey's Second Appeal and Dr. Basseri's Review**

Although the plan provides for only one level of appeal before a claimant files suit in federal court, A.R. 89-90, MetLife's appeal denial letter asserted that Furey "has a right to appeal this decision; as related to his physical conditions."  A.R. 427.  Furey's counsel contacted MetLife

11

1   on February 25, 2019, asking it to "confirm in writing that Mr. Furey is entitled to file in federal

2   court upon receipt of the August 31, 2018 appeal denial," and that "[o]therwise . . . this email

3   serves as Mr. Furey's timely notice of his appeal of MetLife's August 31, 2018 appeal denial."

4   A.R. 411 (emphasis removed).

5          In response, MetLife engaged a second medical reviewer through Genex, Benjamin

6   Basseri, M.D.  Dr. Basseri reviewed the file and issued a report on March 26, 2019.  A.R. 400-

7   406.  Dr. Basseri concluded that the "medical information does not support functional limitations

8   as of 8/27/17."  A.R. 403.  He addressed Furey's CPET report, writing that the "report states

9   maximal effort" and that "it appears that the testing is valid.  There were not invalidity measures

10  triggered."  A.R. 405.  However, he concluded that the CPET results were not consistent with

11  clinical findings, writing that "although there is evidence that peak oxygen consumption 65% of

12  predicted and reduced ventilator/anerobic threshold on this one test, there is limited evidence in

13  [the] medical record of cardiopulmonary dysfunction to corroborate this testing."  A.R. 405.  He

14  concluded that "[s]ince there does not appear to be significant evidence of cardiopulmonary

15  dysfunction, the CPET testing does not appear to be of significance in regards to determining

16  functional status related to history of hereditary hemochromatosis and biopsy determined NAFLD

17  and NASH, and low testosterone."  A.R. 405.  According to Dr. Basseri, despite Furey's

18  complaints of fatigue, "there is limited evidence of consistent individual reports of SOB,

19  exertional fatigue, or difficulties with ADLs requiring strenuous activity."  A.R. 405.

20         On March 28, 2019, MetLife sent Dr. Basseri's report to Furey's attorney and asked him to

21  provide the report to Furey's health care providers "and have them comment on the report or

22  submit additional information if they choose to do so."  A.R. 389.  MetLife received no response.

23  MetLife issued a second denial of Furey's appeal of the termination of his claim on April 12,

24  2019, A.R. 353-57, relying on Dr. Basseri's report and upholding its previous decision to

25  terminate Furey's long-term disability benefits:

26              [B]ased on all the evidence in the file, taking into consideration the
                opinion of the Consultant, as well as Mr. Furey's own health care
27              providers, we find that the clinical evidence available for review was
                insufficient to support a severity of impairment that resulted in
28              functional limitations and restrictions that would have prevented

United States District Court
Northern District of California

12

1    him from performing the duties of his own or any occupation
     beyond August 26, 2017.

2    A.R. 355.

3    ## II.    PROCEDURAL HISTORY

4        Furey filed a complaint against MetLife in April 2019 asserting a single claim for relief for

5    recovery of employee benefits pursuant to 29 U.S.C. § 1132(a)(1)(B).  The parties stipulated that

6    this matter would be resolved on the merits through dispositive cross-motions for judgment

7    pursuant to Rule 52.  [Docket Nos. 14 (Joint Case Management Statement), 20 (Minute Order).]

8    ## III.   LEGAL STANDARD

9        ERISA allows a participant in an employee benefit scheme to bring a civil action to

10   recover benefits due under the terms of a plan.  29 U.S.C. § 1132(a)(1)(B).  The court applies a de

11   novo standard of review to actions for the recovery of ERISA benefits unless the plan in question

12   grants discretionary authority to the trustee or fiduciary.  *Firestone Tire & Rubber Co. v. Bruch*,

13   489 U.S. 101, 114–15 (1989).  In this case, the parties agree that de novo review is appropriate.

14   Pl.'s Mot. 18; Def.'s Mot. 14.

15       "When conducting a de novo review of the record, the court does not give deference to the

16   claim administrator's decision, but rather determines in the first instance if the claimant has

17   adequately established that he or she is disabled under the terms of the plan."  *Muniz v. Amec*

18   *Const. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010); s*ee also Abatie v. Alta Health & Life*

19   *Ins. Co*., 458 F.3d 955, 963 (9th Cir. 2006) (under de novo review, "[t]he court simply proceeds to

20   evaluate whether the plan administrator correctly or incorrectly denied benefits . . .").  The

21   claimant has the "burden of proving by a preponderance of the evidence that he was disabled

22   under the terms of the plan."  *Armani v. Nw. Mut. Life Ins. Co*., 840 F.3d 1159, 1163 (9th Cir.

23   2016).  "In a Rule 52 motion, as opposed to a motion for summary judgment, the court does not

24   determine whether there is an issue of material fact, but whether the plaintiff is disabled under the

25   policy."  *Wiley v. Cendant Corp. Short Term Disability Plan*, No. C 09-00423 CRB, 2010 WL

26   309670, at *6 (N.D. Cal. Jan. 19, 2010).  "The Court is to 'evaluate the persuasiveness of

27   conflicting testimony,' and make findings of fact."  *Id*. (quoting *Kearney v. Standard Ins. Co*., 175

28   F.3d 1084, 1095 (9th Cir. 1999) (en banc) ("In a trial on the record . . . the judge can evaluate the

United States District Court
Northern District of California

13

1    persuasiveness of conflicting testimony and decide which is more likely true.")).[2]

2    **IV.    CONCLUSIONS OF LAW**

3         Furey seeks review of MetLife's termination decision under 29 U.S.C. § 1132(a)(1)(B).

4    This provision allows a plan participant "to recover benefits due to him under the terms of his

5    plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits

6    under the terms of the plan." *Id.*

7         **A.    The Parties' Arguments**

8         In his opening brief, Furey argues that the plan's mental health limitation is ambiguous and

9    must be construed against MetLife.  He argues that the mental health limitation must be

10   interpreted to mean that if his physical medical conditions are independently disabling from his

11   mental health conditions, the limitation does not apply.  Pl.'s Mot. 19-20.  According to Furey, the

12   preponderance of the evidence demonstrates that the mental health limitation does not apply and

13   that he is entitled to long-term disability benefits due to disabling fatigue.  *Id.* at 20-22.  He does

14   not address the plan's definitions of "disability" and "disabled" in his opening brief.

15        For its part, MetLife addresses the mental health limitation only in passing in its opening

16   brief; instead, it argues that Furey was not entitled to ongoing long-term disability benefits beyond

17   the 24 months he received because he "did not satisfy the definition of disability under the terms

18   of the Plan."  Def.'s Mot. 16.  MetLife contends that "the medical evidence did not show Plaintiff

19   had ongoing functional limitations as a result of his hemochromatosis that would prevent him

20   from working."  *Id.*

21        The parties clarified their positions at the hearing.  Stating that "no one is arguing that Mr.

22

23   _____

24   [2] The court determines Furey's entitlement to benefits "based on the evidence in the administrative
     record and 'other evidence as might be admissible under the restrictive rule'" set out in *Mongeluzo*
25   *v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943-44 (9th Cir. 1995).
     *Opeta v. Nw. Airlines Pension Plan for Contract Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007)
26   (quotation omitted).  Under that rule, a court may consider extrinsic evidence "*only* when
     circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate de
27   novo review of the benefit decision."  *Mongeluzo*, 46 F.3d at 944 (quotation omitted) (emphasis in
     original).  The court concludes that it need not consider any extra-record evidence and disregards
28   the exhibit attached to the declaration of Brian H. Kim in support of Furey's motion for judgment.
     [*See* Docket No. 22-1.]

United States District Court
Northern District of California

1   Furey can go to work," MetLife's counsel conceded that Furey satisfies the definition of disabled

2   under the plan. Instead, the parties dispute whether the mental health limitation applies.  As noted,

3   that limitation provides that long-term disability benefits are limited to a period of 24 months

4   where a claimant is "[d]isabled due to . . . a Mental or Nervous Disorder or Disease," with certain

5   exceptions that do not apply here.  A.R. 75.  Regarding the construction of the "due to" clause,

6   MetLife agrees with Furey that the court should construe the mental health limitation to require

7   "but-for" causation; that is, the mental health limitation "applies only if a mental health condition

8   is a 'but-for' cause of [Furey's] disability, such that if [Furey's] physical condition would be

9   independently disabling, then the mental health limitation does not apply."  *See Doe v. Prudential*

10  *Ins. Co. of Am.*, 245 F. Supp. 3d 1172, 1186 (C.D. Cal. 2017).  The parties' dispute thus turns on

11  whether Furey's physical medical conditions result in disabling functional impairments.

12  According to MetLife, the medical evidence does not support the conclusion that Furey's

13  hemochromatosis, liver disease, and low testosterone result in disabling fatigue.  It argues that

14  these diagnoses alone are insufficient to establish that Furey is disabled and entitled to benefits

15  under the plan.

16      **B.      Furey is Disabled Under the Terms of the Plan**

17      Applying the de novo review standard, and having carefully reviewed and considered the

18  administrative record, the court finds that Furey has shown by a preponderance of the evidence

19  that the mental health limitation does not apply because Furey's physical medical conditions are

20  independently disabling.

21      The record contains clear documentation of Furey's fatigue from each of his treating

22  physicians.  Furey reports first experiencing fatigue in 2014.  Following tests, he was diagnosed

23  with hemochromatosis and began undergoing phlebotomies to treat the condition.  *See* Furey Decl.

24  ¶ 4.  Furey consistently reported fatigue to physicians treating him for hemochromatosis.  These

25  reports of fatigue predated his reports of "social anxiety and depressed mood" that led to a referral

26  to a mental health care provider.  *See, e.g.*, A.R. 876-78 (Karamlou treatment note, 7/28/14), 878-

27  80 (Karamlou treatment note, 8/8/14), 896 (Karamlou Nurse Practitioner treatment note, 2/6/15),

28  1874 (Zlock treatment note, 3/24/15), 912 (Karamlou treatment note, 6/8/16); 785 (Robles

1   treatment note, 12/28/17); 783 (Robles treatment note, 4/26/18).

2          Each of Furey's treating physicians tied his fatigue to his physical medical conditions.

3   Upon his diagnosis, treating physician Dr. Karamlou wrote that Furey "had significant symptoms

4   at the time of his presentation associated with [hereditary hemochromatosis] including liver

5   dysfunction and also hormonal disturbances, and that "the original presenting symptoms could

6   have had an impact on his functional abilities."  A.R. 867.  Another treating physician, Dr. Robles,

7   later confirmed Furey's hemochromatosis diagnosis and wrote that individuals with the condition

8   "are known to have issues with fatigue, muscle and joint achiness."  A.R. 781.  In March 2015, a

9   third treating physician, Dr. Zlock, prescribed a higher daily dose of testosterone in response to

10  Furey's complaint of increased fatigue and depression.  A.R. 1874-75.  Another practitioner noted

11  Furey's report that his mental health "was worse when his ferritin was high."  A.R. 896.

12         In 2016, Furey was diagnosed with NASH and NAFLD and underwent treatment for the

13  same at UCSF.  A.R. 513, 601-67.  According to unrebutted medical literature in the record,

14  "[f]atigue is a significant symptom in nonalcoholic fatty liver disease (NAFLD) that impacts upon

15  quality of life and is unrelated to liver disease severity."  A.R. 670; *see also* A.R. 675 ("Fatigue is

16  a significant problem in NAFLD . . . and is associated with impairment in physical function.

17  Fatigue in NAFLD appears to be unrelated to either severity of underlying liver disease or insulin

18  resistance, but is associated with significant daytime somnolence.").

19         The January 2018 CPET evaluation corroborated Furey's reports of functional limitations.

20  Following the evaluation, Dr. Snell concluded that "even a sedentary job would require more

21  energy than [Furey] is able to safely sustain."  Accordingly, he opined that Furey is precluded

22  from "employment of even a sedentary/stationary nature."  A.R. 921, 922, 926.  Importantly, on

23  July 5, 2018, Dr. Robles wrote to MetLife about Furey's condition and discussed the CPET

24  evaluation.  A.R. 499.  Dr. Robles noted that Furey "has reported significant fatigue during his

25  treatment" and that the CPET results "indicate[ ] cardiopulmonary impairment that is consistent

26  with his reports of fatigue."  A.R. 499.  He went on to observe that "[t]he level of fatigue that

27  patients with hemochromatosis experience does not depend on the presence or severity of any liver

28  damage or cirrhosis."  *Id.*

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1    Treating physicians are not accorded special weight in the ERISA context.  *Black &*

2 *Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Nonetheless, a claimant's reliable

3 evidence must be credited, *see id.*, and there is nothing in the record suggesting that the opinions

4 of Drs. Robles and Karamlou about the functional limitations resulting from Furey's physical

5 medical conditions are not reliable.  Moreover, Furey's statement and his wife's statement

6 corroborate Furey's physicians' observations.  As discussed, Furey and his wife submitted sworn

7 declarations describing his condition and fatigue, with his wife stating that Furey "cannot even

8 carry a vacuum one flight of stairs without getting exhausted and having to lie down," and that

9 "even walking around the neighborhood makes him extremely tired."  Alma Furey Decl. ¶ 4.  She

10 states, "I have to be careful not to tire him out—I can't even have him help me get up off the floor

11 if I'm sitting on the floor, because just pulling me up exhausts him."  *Id.*  Furey himself states that

12 "[o]n most days," minor tasks exhaust him and he has to "lie down and/or take a nap for 1-3 hours

13 every few hours" to recover.  Furey Decl. ¶ 6.  While he has "good days," they do not occur more

14 than 2-3 days per week.  *Id.* at ¶ 7.  Both indicated that Furey's fatigue pre-dated his depression,

15 and that his physical condition subsequently impacted his mental health.  *Id.* at ¶¶ 4, 5; Alma

16 Furey Decl. ¶ 6.

17    Ultimately, the court must weigh the opinions of Furey's treating physicians and Dr. Snell

18 against the views of the physicians hired by MetLife, Drs. Schmidt and Basseri, to review Furey's

19 claim.  The court finds that the opinions of Drs. Robles, Karamlou, and Snell are more reliable on

20 the subject and cause of Furey's functioning, primarily because Drs. Schmidt and Basseri never

21 met Furey in person, let alone examined him.  Instead, they based their opinions entirely on their

22 review of his medical records.  *See, e.g., Parr v. First Reliance Standard Life Ins. Co.*, No. 15-cv-

23 01868-HSG, 2017 WL 1364610, at *13 (N.D. Cal. Mar. 31, 2017) (finding treating physicians

24 "more reliable and probative" than insurer's retained physicians; noting treating physicians "have

25 much greater familiarity with the patient than [the] hired physicians, which makes the opinions of

26 the former substantially more compelling on this record." (citing *Jebian v. Hewlett-Packard Co.*

27 *Emp. Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1109 n.8 (9th Cir. 2003)).  Drs. Robles and

28 Karamlou have been treating Furey since 2014, and Dr. Snell examined Furey over the course of

1   two days.

2          The opinions of Drs. Schmidt and Basseri suffer from other deficiencies.  While Dr.

3   Schmidt acknowledged that the CPET evaluation revealed "significant abnormalities," she

4   dismissed the results as "not clear in etiology or origin," even though Furey has been diagnosed

5   with hemochromatosis, liver disease, low testosterone, NAFLD and NASH, all of which can cause

6   fatigue.  *See* A.R. 845.  She subsequently conceded that hemochromatosis, liver disease, and low

7   testosterone "can cause fatigue," but wrote that "cardiopulmonary testing itself is . . . not adequate

8   to state someone is functionally limited" because "there is no certain etiology or confirmed basis

9   to support the results, not to mention possible test errors."  A.R. 588.  In a subsequent addendum,

10  Dr. Schmidt again discounted the findings of the CPET evaluation, noting that the test "may be

11  interfered with many different errors, ranging from poor effort to measurement error."  A.R. 472-

12  73.  Notably, Dr. Schmidt did not address the other evidence in the record of Furey's physical

13  limitations that is consistent with the CPET results, including Furey's own statement, his wife's

14  statement, and the observations of his treating physicians.  Dr. Schmidt also did not cite anything

15  in the results supporting her speculation that the test could be invalid; in fact, the results expressly

16  state that Furey's effort was "normal" and that there was no evidence of malingering.  A.R. 923.

17  In fact, Dr. Basseri reviewed the CPET evaluation results and concluded that the results appeared

18  "valid" and that the testing reflected "maximal effort" by Furey.  A.R. 405.

19         For his part, Dr. Basseri discounted the CPET results by asserting that they were not

20  "significan[t]" in the absence of cardiopulmonary dysfunction, without citing any evidence in

21  support of his assertion.  A.R. 395.  He also did not address Dr. Robles's opinion that the

22  evaluation "indicates cardiopulmonary impairment that is consistent with [Furey's] reports of

23  fatigue."  *See* A.R. 499.[3]  Like Dr. Schmidt, Dr. Basseri did not discuss the record evidence of

24  _____

25  [3] The parties dispute the significance of the CPET results.  Furey cites *Medefesser v. Metro. Life Ins. Co.*, No. 6:18-CV-00041-MK, 2019 WL 6481794, at *11 (D. Or. Sept. 5, 2019), *report and*

26  *recommendation adopted*, 2019 WL 6467818 (D. Or. Dec. 2, 2019), in which the court noted that a CPET "is endorsed by the medical community to be 'the gold standard' and 'the most accurate

27  measurement of functional capacity'" and concluded that a treating physician's opinion and supporting CPET results "corroborate[d] Plaintiff's subjective reports" of pain and fatigue.  In

28  response, MetLife cites *Western v. Unum Life Ins. Co. of Am.*, No. CV 16-9527-JFW (ASx), 2018 WL 6071090, at *9 (C.D. Cal. Jul. 3, 2018), in which the court described a reviewing physician's

United States District Court
Northern District of California

1     Furey's functional limitations.  More importantly, even though Drs. Schmidt and Basseri each

2     concluded that Furey's diagnoses of hemochromatosis, liver disease, and low testosterone do not

3     "support functional limitations," A.R. 403, 844, neither consultant disputed Furey's documented

4     fatigue or expressed an opinion about the cause of it, which is the sole disputed issue in this case.

5     As noted, MetLife does not dispute that Furey is unable to work at all due to his limitations, but

6     other than the opinions of Drs. Schmidt and Basseri that Furey's physical medical conditions do

7     not result in functional limitations, it offers no evidence at all to support its determination that only

8     Furey's mental health conditions result in disabling functional limitations.

9         Furey's award of SSDI benefits further supports the conclusion that his physical medical

10    conditions are independently disabling.  "Social Security disability awards do not bind plan

11    administrators, but they are evidence of disability."  *Salomaa v. Honda Long Term Disability*

12    *Plan*, 642 F.3d 666, 679 (9th Cir. 2011).  MetLife argues that the ALJ's decision supports its

13    decision to terminate benefits, asserting that the ALJ determined that Furey cannot work due to

14    mental health limitations and that Furey is able to perform "a range of light exertional work."

15    Def.'s Mot. 22.  But this mischaracterizes the ALJ's opinion.  In fact, the ALJ concluded that

16    Furey "is limited to a range of light exertional work, *primarily due to fatigue and malaise*," with

17    the additional limitations that Furey would be able to walk for only two hours in an eight-hour

18    workday and would be absent from work two days a month.  A.R. 459-60 (emphasis added).  The

19    ALJ thus concluded that Furey did not have "the residual functional capacity to perform the full

20    range of light work," and a vocational expert found that there were no jobs in the national

21    economy that Furey could perform given his limitations.  A.R. 460 ("If the claimant had the

22    residual functional capacity to perform the full range of light work . . . a finding of 'not disabled'

23

24    disagreement that the CPET is "the 'gold standard' for evaluating functional capacity and fatigue."
      Notably, the reviewing physician in *Western* also noted inconsistencies between the CPET results
25    and the plaintiff's own report of his physical activities and performance on a treadmill test two
      months prior to the CPET, *see id.*; such inconsistencies are entirely absent in Furey's case.  In any
26    event, the court need not resolve this dispute and make a finding regarding whether and to what
      extent CPET evaluates functional capacity, because Furey does not rest his entitlement to benefits
27    solely on that testing.  Further, Dr. Robles, who has a treating relationship with Furey, endorsed
      the results of the testing and concluded that the results are "consistent with [Furey's] reports of
28    fatigue."  *See* A.R. 499.

United States District Court
Northern District of California

would be directed by Medical-Vocational Rule 202.21.").

In sum, the court concludes that the record contains ample evidence of Furey's physical medical conditions.  There is also considerable evidence that these conditions result in fatigue, which MetLife does not dispute is disabling.  Given this evidence and given the absence of record evidence connecting Furey's mental health conditions with his disabling fatigue, the court concludes that Furey has established by a preponderance of the evidence that his physical condition is independently disabling.  The mental health limitation thus does not apply and MetLife's determination to the contrary is reversed.

## V.       CONCLUSION

For the foregoing reasons, Furey's motion for judgment is granted.  The parties shall meet and confer on the amount of outstanding long-term disability benefits due Furey and submit a stipulated proposed judgment within 21 days of the date of this order.

**IT IS SO ORDERED.**

Dated: August 10, 2020



Donna M. Ryu
United States Magistrate Judge
Judge Donna M. Ryu

United States District Court
Northern District of California